**In the Interest of N.C., A Child.**

**L.C. and T.C., Appellants.**

No. 95–1023.

Supreme Court of Iowa.

July 24, 1996.

Stephanie C. Hassler of Roeder & Hassler, Manchester, for appellants.

Thomas J. Miller, Attorney General, and Kathrine S. Miller–Todd, Assistant Attorney General, for appellees.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and TERNUS, JJ.

LARSON, Justice.

The juvenile court found Nathan C., a child born on February 21, 1982, to be a child in need of assistance (CINA) under Iowa Code section 232.2(6)(f) (1995). This adjudication was based on the failure of Nathan's parents to adequately deal with Nathan's troubled life resulting from his conditions diagnosed as intermittent explosive disorder, overanxious disorder, attention deficit hyperactivity disorder (ADHD), aggressive-type conduct disorder, and learning disability. The court of appeals reversed. On further review, we vacate the court of appeals decision and affirm the judgment of the district court.

A child in need of assistance, under one statutory definition, is one who

is in need of treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior toward self or others and whose parent, guardian, or custodian is unwilling or unable to provide such treatment.

Iowa Code § 232.2(6)(f) (1995). We review CINA proceedings de novo. *In re B.B.*, 500 N.W.2d 9, 11 (Iowa 1993). Our paramount concern, of course, is the best interest of the child. *Id.*

The State has the burden of proving the allegations of its CINA petition by clear and convincing evidence. Iowa Code § 232.96(2). This is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. *King v. King*, 291 N.W.2d 22, 24 (Iowa 1980).

## I. *Background.*

Nathan has had a long history of aggressive behavior and temper outbursts, including threats and intimidation toward his parents and his five siblings. He has severely damaged the family automobile, destroyed doors in the home, and punched holes in the walls. He has thrown objects at family members and has threatened to hurt himself and others with knives. His most aggressive behavior was exhibited when his parents attempted to control him. At times, he reacted to discipline by running away from home.

When Nathan was approximately ten, his parents requested services from the Department of Human Services (DHS). As a result, the parents received parental skills training and family therapy. Family-centered services, provided twice weekly, began in early 1993. These services were intended to help the parents regain control of their home, which, Nathan's siblings believed, was under Nathan's control.

Nathan was referred to the Manchester Mental Health Clinic. Dr. Castillo, a psychiatrist at the clinic, prescribed several treatments, which helped Nathan improve his behavior to some extent. However, treatment and counseling of Nathan and his family have met with only mixed success. Elizabeth Bradke, a DHS social worker, testified that "things would just start getting a little bit better and things were going smoothly within the home, and then something would happen, and it would just break loose again, and we'd ... lose everything that we ... seemed to have gained."

In May 1994, Nathan was referred to Jim Knott, a counselor at the Delaware County Mental Health Center, who saw Nathan on a weekly basis until February of 1995, when his parents stopped scheduling appointments. At times Nathan refused to attend counseling sessions. Mr. Knott testified that he saw improvement in Nathan through the summer of 1994, but observed that Nathan did not handle school very well and that his condition deteriorated in the fall. Knott testified that he never actually saw an aggressive outburst by Nathan, but that he was always "very intense and ... he was compliant just to get me out of there."

In early 1995, Nathan's behavior worsened. He refused to go to school for almost three months. Once, when his mother told him she was going to take him to school, he threw hot coffee at her. During one argument with his father, Nathan threw a butcher knife at him. After another argument, Nathan made an unsuccessful suicide attempt. On several occasions, he tore the telephone cord from the wall to prevent his parents from reporting his behavior to social workers.

In April 1995, Nathan's parents decided to voluntarily place him in Tanager Place, a residential treatment facility. On April 17, 1995, the State filed a petition to have Nathan found to be a child in need of assistance under Iowa Code sections 232.6(f) and 232.6(k). When Nathan was told of his parents' decision, he threatened to use a knife on himself, then ran away. On the same day, the juvenile court entered an emergency commitment order to send him to St. Luke's Hospital in Cedar Rapids. *See* Iowa Code § 229.6A (1995) (involuntary hospitalization of minors).

Nathan was treated at St. Luke's for nine days. His medication was adjusted, and his behavior improved. A doctor who had treated him strongly recommended, however, that he be placed in a residential treatment facility "to work on behavior problems independent of his primary diagnosis of ADHD and overanxious disorder." The doctor noted that, under structure and guidance in the hospital, Nathan had no significant explosive episodes. Nevertheless, the doctor expressed concern that, if Nathan's behavior was not addressed soon, it would be almost impossible to change it. Despite this warning, Nathan's parents changed their minds about placing him in Tanager Place and told the DHS that they wanted him to be returned home.

A dispositional hearing was held on May 15, 1995. At that hearing the parents testified that Nathan's behavior had improved since his return from St. Luke's and that the experience had taught him that there were consequences for his misbehavior. The State countered that it was still in the best interest of Nathan, and the family, for him to be placed in residential treatment and for the family to continue in family services.

The juvenile court noted (1) the lack of improvement in the home situation after two and one-half years of services provided by the State, (2) the extensive amount of school missed by Nathan, (3) the social workers' recommendations for residential treatment, and (4) the emotional injuries Nathan had caused other family members. The court agreed with the State that the improvement in Nathan's behavior since he returned from St. Luke's was only a temporary phenomenon. It found him to be a child in need of assistance as defined by Iowa Code section 232.2(6)(f).

## II. *The Issue.*

The issue on appeal is not whether the first element of section 232.2(6)(f) has been met, *i.e.*, whether the child needs treatment; the parents concede that he does. The issue is whether the State has proven the second element, that the parents are "unwilling or unable to provide such treatment."

The parents argue that there was not clear and convincing evidence on the second element because they had sought assistance for Nathan in the past and would continue to do so. The State counters that the parents are unwilling or unable to provide for *effective* treatment.

The record is clear that these parents are willing and able to provide *some* treatment for Nathan. But section 232.2(6)(f) requires treatment that will "cure or alleviate serious mental illness or disorder, or emotional damage." It does not mean such treatment as the parents, in their own judgment, deem to be appropriate.

The treatment that these parents are willing to provide is not sufficient to comply with this definition; it has failed in the past and

appears to be doomed to fail in the future. The parents' approach has been to allow Nathan to have his way in the family in order to avoid confrontations with him, even though he has threatened the physical and emotional well-being of himself and those around him.

All of the therapists, counselors, and psychiatrists who have dealt with Nathan have recommended residential treatment due to the family's continued inability to control his behavior. We agree with the district court that inpatient care is the only treatment that can reasonably be foreseen as effective.

We vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.**